UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION at ASHLAND
Case: 0:22-cv-00042-HRW

BRITNEY ALLEN JONES, as Administratrix
of the Estate of Chad Lake Raymond                         PLAINTIFF

v.

WELLPATH, LLC;
BETTY NOBLE;
JENNIFER BLANTON;
LELAND SEXTON;
CHRISTOPHER STEVENS; and
LACY RUSSELL                                               DEFENDANTS

---

### DEFENDANTS' TRIAL MEMORANDUM
---

\* \* \* \* \* \* \* \* \* \*

Comes Defendants Wellpath, LLC, Betty Noble, Christopher Stevens, Leland Sexton, Jennifer Blanton, and Lacy Russell, (collectively "Defendants" or "Wellpath Defendants") by counsel, and in compliance with the Court's Amended Scheduling Order, entered on May 13, 2024, submits the following Trial Memorandum.

### FACTS

Mr. Raymond first presented to the Wellpath healthcare staff on March 30, 2021, complaining of chest pain and pain in left lung at times. He presented without a fever, unremarkable vital signs, and unremarkable physical exam findings. Specifically, Mr. Raymond stated he vomited the day prior for the first time. He ambulated to the medical exam room with a steady gait. Mr. Raymond had no facial grimacing or guarding noted. His skin was warm and dry. His respirations were even and unlabored. Mr. Raymond's lungs were clear. It was noted that he had an elevated heart rate and complained of his head hurting. Mr. Raymond informed the staff

that he had taken four doses of Bactrim, began to feel better, but was out of antibiotics. Notably, Mr. Raymond admitted to "shooting up suboxone two weeks prior." An EKG was ordered and completed with normal findings. A chest x-ray was ordered. A transthoracic echocardiogram was ordered and completed. The results were received and reviewed by Betty Noble the following day. The result indicated there were vegetations or significant valvular abnormalities. Specifically:

> CONCLUSION: Normal left ventricular systolic function Mild left ventricular hypertrophy Normal diastolic function Trace tricuspid regurgitation. The diagnosis is ascites. LV function is normal and therefore there is no evidence of a cardiac etiology for the ascites.

Betty Noble gave a verbal order for Bactrim and Rifampin. She advised Mr. Raymond to follow up if his symptoms continued or worsened.

On April 6, 2021, Betty Noble saw Mr. Raymond again, and the chest x-ray was promptly performed. The findings were normal, and Betty Noble did not note any abnormality of his vital signs. On April 8, 2021, Mr. Raymond received the COVID vaccine, and no complaints were noted in his medical chart. On April 13, 2021, Mr. Raymond received a PPD test for tuberculosis, and no complaints were noted in his medical chart.

On April 15, 2021, Mr. Raymond presented to medical for his annual physical. He had no complaints; no fever; normal vital signs aside from a non-specific tachycardia; his blood oxygen level and respirations were normal; and his lung exam was normal with clear lungs and no respiratory distress. He continued with his prescriptions of Xopenex, Naproxen, and Prednisone.

Mr. Raymond did not fill out a healthcare request form or come to the Wellpath healthcare staff's attention for the next twelve days, aside from a request for Ibuprofen on April 26, 2021. He had been instructed to follow-up if his symptoms continued or worsened and he was able to access healthcare.

On April 27, 2021, at 4:35 a.m., Mr. Raymond was brought to medical in a wheelchair. He presented with complaints of "spitting up bright red blood, and unable to ambulate for a number of days." Mr. Raymond stated he had been diagnosed with bronchitis and had been using an Inhaler, Prednisone, and Naproxen. This was the first time during his course of treatment over approximately one month that he had a documented fever. Mr. Raymond also had tachycardia and mild tachypnea, but his oxygen saturation and blood pressure was normal, and his lung sounds were clear. Nurse Jennifer Blanton consulted the on-call provider, Leland Sexton, who directed Nurse Blanton to an antipyretic, a nebulized breathing treatment, and to keep Mr. Raymond in the medical observation area until he could be seen by the site provider, Betty Noble, that same morning. A urinalysis was collected, and the results were negative for infection.

When Betty Noble saw Mr. Raymond on April 27, 2021, his temperature was normal, he was no longer tachycardic or tachypneic. His blood pressure and oxygen saturation were normal. Mr. Raymond was complaining of knee and arm pain, which Betty Noble addressed by providing him with an injection in his knee and a pair of crutches to assist him with ambulating.

On April 28, 2021, at 9:38 p.m., Nurse Christopher Stevens was called to the dorm where Mr. Raymond resided. Mr. Raymond complained of nausea and vomiting; pain in his abdomen; and pain in the lower part of his left chest and left back. Mr. Raymond was afebrile, had normal vital signs and oxygen saturation. He was not having any respiratory distress, his lungs were clear, and he was pale but not diaphoretic. He had some abdominal tenderness but no peritoneal signs. Notably, Mr. Raymond was ambulating without issue. Nurse Stevens obtained an EKG which showed normal sinus rhythm, and Mr. Raymond's heart rate was 87 beats per minute (bpm). Nurse Stevens provided Mr. Raymond with a carton of milk at his request. Mr. Raymond stated it "had

helped his symptoms previously." Mr. Raymond also stated he had been given Mylanta two hours prior. Nurse Stevens instructed Mr. Raymond to be seen at sick call in the morning.

On April 29, 2021, at 9:51 a.m., Mr. Raymond presented to medical complaining of stomach pain and a fever, although his temperate was 96.0. He was pale and weak. A urine sample was obtained. Mr. Raymond's vital signs showed tachycardia but were otherwise normal. His pupils were constricted, which can be seen shortly after use of opioid medications, such as Suboxone. Mr. Raymond denied drug use for two months; however, he stated that he was "shooting up Suboxone two months ago." Mr. Raymond received an IV bag due to his complaints of thirst, a urine culture and urinalysis were ordered, blood work/cultures were ordered, and an abdomen ultrasound was ordered and completed. Betty Noble ordered Mr. Raymond to stay in medical observation until he was cleared. During the medical observation period, Mr. Raymond had an abnormal mental status and reported he had snorted Suboxone. Narcan was administered with no changes, and he was sent out to the hospital promptly via ambulance.

Mr. Raymond was transferred from EKCC to Warren County ARH Emergency Department where he presented with dyspnea chest pains and altered mental status. It was noted he informed staff he had been injecting drugs with dirty water in prison. A chest x-ray was performed, and he was diagnosed with septic embolus and lower lobe pneumonia. He was treated for "possible" endocarditis. Mr. Raymond was transferred to Hazard Regional Medical Center for "possible" endocarditis and presented with tachycardia, dyspnea, tachypnea, hypotension, and sepsis. A transthoracic echocardiogram (TTE) was ordered and showed signs of vegetation. A transesophageal echocardiogram was then recommended. Shortly thereafter, a stroke alert was called, and it was determined Mr. Raymond needed to be transferred. He was sent to UK Healthcare, where following surgery related to the stroke, he passed.

## QUESTIONS OF FACTS

1. Did Mr. Raymond have an obviously serious medical need on March 30, 2021, or thereafter?

2. If so, did Betty Noble, Christopher Stevens, Leland Sexton, Jennifer Blanton, and Lacy Russell, have a subjective awareness of Mr. Raymond's obviously serious medical need on March 30, 2021, or thereafter?

3. If so, did Betty Noble, Christopher Stevens, Leland Sexton, Jennifer Blanton, and Lacy Russell have an objective awareness of Mr. Raymond's obviously serious medical need on March 30, 2021, or thereafter?

4. Was Wellpath, LLC, Betty Noble, Christopher Stevens, Leland Sexton, Jennifer Blanton, and Lacy Russell deliberately indifferent to Mr. Raymond's obviously serious medical need?

5. Did Betty Noble, Christopher Stevens, Leland Sexton, Jennifer Blanton, and Lacy Russell require training and supervision pursuant to their Wellpath job description?

6. Was Wellpath, LLC obligated to train and / or supervise Betty Noble, Christopher Stevens, Leland Sexton, Jennifer Blanton, and Lacy Russell pursuant to their Wellpath job description? If so, a) was it an official Wellpath, LLC policy or custom to inadequately train and supervise Betty Noble, Christopher Stevens, Leland Sexton, Jennifer Blanton, and Lacy Russell pursuant to their Wellpath job descriptions; b) did Wellpath, LLC inadequately train and supervise Betty Noble, Christopher Stevens, Leland Sexton, Jennifer Blanton, and Lacy Russell to carry out the duties pursuant to their Wellpath job descriptions; c) was Wellpath, LLC deliberately indifferent to the fact that a violation of Mr. Raymond's Eighth Amendment rights was a highly predictable consequence of Betty Noble, Christopher Stevens, Leland Sexton, Jennifer Blanton,

and Lacy Russell's inadequate training and/or supervision pursuant to their Wellpath job descriptions; and d) did Wellpath, LLC's failure to adequately train and supervise Betty Noble, Christopher Stevens, Leland Sexton, Jennifer Blanton, and Lacy Russell pursuant to their duties included in their Wellpath job descriptions proximately cause the violation of Mr. Raymond's Eighth Amendment rights?

7. Did Wellpath, LLC, Betty Noble, Christopher Stevens, Leland Sexton, Jennifer Blanton, and Lacy Russell breach a duty of care to Mr. Raymond?

8. Was Mr. Raymond's injury caused as a direct result of actions taken by Wellpath, LLC, Betty Noble, Christopher Stevens, Leland Sexton, Jennifer Blanton, and Lacy Russell?

## QUESTIONS OF LAW

1. Was Wellpath, LLC, Betty Noble, Christopher Stevens, Leland Sexton, Jennifer Blanton, and Lacy Russell provided with information from which the inference could be drawn that Mr. Raymond faced a substantial risk of serious harm? Given knowledge of such a risk, did Wellpath, LLC, Betty Noble, Christopher Stevens, Leland Sexton, Jennifer Blanton, and Lacy Russell then fail to act adequately to prevent harm?[1]

2. Did Wellpath, LLC, Betty Noble, Christopher Stevens, Leland Sexton, Jennifer Blanton, and Lacy Russell knowingly disregard a serious risk of harm to Mr. Raymond's health and safety?[2]

3. Did Mr. Raymond suffer a violation of his Eighth Amendment rights as a result of Wellpath, LLC's official policy or custom to inadequately train and supervise Betty Noble, Christopher Stevens, Leland Sexton, Jennifer Blanton, and Lacy Russell pursuant to their Wellpath

---

[1] *Farmer v. Brennan*, 511 U.S. 825, (1994); see also *Street v. Corrections Corporation of America*, 102 F.3d 810, 815-816 (6th Cir. 1996).
[2] *Williams v. Delo*, 49 F.3d 442, 446 (8th Cir. 1995); *see also Johnson v. Boreani*, 946 F.2d 67, 71 (8th Cir. 1991).

job descriptions, the lack of which training and the need for which training was so obvious that Mr. Raymond's death was a highly predictable consequence thereof?[3]

    4.    Was Wellpath, LLC, Betty Noble, Christopher Stevens, Leland Sexton, Jennifer Blanton, and Lacy Russell negligent in their actions regarding Mr. Raymond?[4]

    Respectfully Submitted,

    QUINTAIROS, PRIETO, WOOD & BOYER, P.A.

*/s/ Alexandria C. Whittington*
Alexandria C. Whittington, Esq. #98898
Michael L. Vittori, Esq. IL #6192073
*Admitted Pro Hac Vice*
Brandon C. R. Sword, Esq. #97780
9300 Shelbyville Road, Suite 400
Louisville, KY 40222
E-mail: alexandria.dobrowolski@qpwblaw.com
michael.vittori@qpwblaw.com
brandon.sword@qpwblaw.com
Telephone: 502-423-6390
Facsimile: 502-423-6391
***Counsel for Defendants***

---

[3] *Monell v. Dep't of Social Servs.*, 436 U.S. 658, (1978); *Starcher v. Correctional Medical Systems, Inc.,* 7 Fed. App'x 459 (6th Cir. 2001); *Shadrick v. Hopkins Cty., Ky*., 805 F.3d 724, 739 (6th Cir. 2015).
[4] *Fryman v. Harrison*, 896 S.W. 2d 908 (1995).

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was served on this the 16th day of September, 2024, upon the following through the Court's electronic filing system:

Gregory A. Belzley
gbelzley3b@gmail.com
P.O. Box 278
Prospect, Kentucky 40059
*Counsel for Plaintiff*

Christopher L. Rhoads
chris@rhoadsandrhoads.com
Rhoads & Rhoads, PSC
115 East Second Street, Suite 100
Owensboro, KY 42302
*Counsel for Plaintiff*

/s/ Alexandria C. Whittington
*Counsel for Defendants*